**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-1(b)

**TRENK, DiPASQUALE,
DELLA FERA & SODONO, P.C.**
347 Mt. Pleasant Avenue, Suite 300
West Orange, NJ 07052
(973) 243-8600
Anthony Sodono, III
Sari B. Placona
*Counsel to Amboy Group, LLC, et. al.,*
*Chapter 11 Debtors and Debtors-in-Possession*

In re:

AMBOY GROUP, LLC, *et al.*,[1]

Debtors.

Case No. 17-31653
(Joint Administration Pending)
Judge: Christine M. Gravelle
Chapter 11
**Hearing Date:  TBD**
**Obj. Deadline: TBD**

**DEBTORS' MOTION FOR AN INTERIM ORDER AND FINAL ORDER
AUTHORIZING DEBTOR TO: (A) OBTAIN SENIOR SECURED POST-PETITION
FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364(d)(1) (B) UTILIZE
CASH COLLATERAL PURSUANT TO U.S.C. §§ 105, 361, 362, AND 363; (C) GRANT
ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDER PURSUANT
TO 11 U.S.C. 105, 362 AND 363; (D) SCHEDULE FINAL HEARING PURSUANT TO
RULES 4001(b), 4001(c) AND 9014; AND (E) GRANTING RELATED RELIEF**

Amboy Group, LLC, *et al.* (the "Debtors"), the debtors and debtors-in-possession in the

above-captioned case (the "Chapter 11 Case"), hereby submit this emergency motion (the "Cash

Collateral Motion" or "Motion"), for entry of an interim order (the "Interim Cash Collateral

Order") and final order (the "Final Cash Collateral Order", and collectively, the "Cash Collateral

Orders"), pursuant to sections 105(a), 361, 362, 363, and 364(d) of title 11 of the United States

Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") and rules 2002, 4001 and

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers, are: (i)
Amboy Group, LLC (8971) and (ii) CLU Amboy, LLC (5726).

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and: (a) to obtain senior secured post-petition financing (the "DIP Financing") pursuant to the terms of that certain Debtor-in-Possession Loan and Security Agreement and Grid Promissory Installment Note (the "DIP Financing Documents") to be entered into by and between the Debtor and Primary Capital Partners ("Primary Capital" or the "Lender"), (b) to utilize cash collateral, as defined in Section 363(a) of the Bankruptcy Code, (the "Cash Collateral") of its prepetition lender, Newtek Small Business Finance, LLC. ("Newtek" or "Prepetition Lender"), (c) granting certain adequate protection to Prepetition Lender; and (d) scheduling the final hearing with respect to the relief requested herein (the "Cash Collateral Motion").

1.      All of the income generated by the Accounts Receivables (as hereinafter defined) and, accordingly, all of Debtors' cash generated therefrom, whether held by Debtors or Prepetition Lender, including any and all funds contained in Debtors' bank accounts, is Cash Collateral. Debtors' use of Cash Collateral is critical to its ability to continue operating as a going concern during the course of this Chapter 11 Case thereby maximizing the value of Debtors' assets for the benefit of its estate, its creditors and its equity interest holders. Cash Collateral will be used to fund ongoing expenses of the operation of the businesses. Indeed, absent sufficient funds to support Debtors' operations, the value of the Debtors' businesses will deteriorate substantially and any chance for a meaningful recovery by Debtors' estate, creditors and equity interest holders will be impaired. Further, Debtors' inability to access DIP Financing and to use Cash Collateral will cause a shutdown of the businesses and the unemployment of over 60 employees right before the holiday season.

2.      Debtors believe the authorization and approval of Debtors' post-petition DIP Financing and use of Cash Collateral and granting adequate protection to the Prepetition Lender, pending the Final Hearing, is in the best interests of Debtors' estate and its creditors.

3.      This Cash Collateral Motion is supported by the (i) *Certification of William Colbert Filed in Support of First Day Applications and Motions* (the "Colbert Certification") and the (ii) *Certification of William McNamara Filed in Support of First Day Applications and Motions* (the "McNamara Certification") (collectively, the "Certifications"), (ii) any documentary evidence or arguments of counsel presented to the Court; and (iii) the legal arguments set forth below.

4.      By this Motion, Debtor requests the following relief:

(a)      to obtain senior secured post-petition financing,

(b)      authorizing Debtors to use Cash Collateral, subject to a Carve-Out (hereinafter defined) for the purpose of (i) operating and managing their businesses, (ii) payment of professional fees, and (iii) paying fees required to be paid to the United States Trustee pursuant to 28 U.S.C. § 1930 (the "US Trustee Fees"), all in accordance with the Budget (attached as **Exhibit "A"** and subject to the terms, conditions, and limitations set forth in the Cash Collateral Orders;

(c)      providing adequate protection (the "Adequate Protection") to the Prepetition Lender for any Diminution in Value (defined below) of its interests in its Prepetition Collateral (defined below), including the Cash Collateral; and

(d)      scheduling a hearing to consider the relief requested herein not less than fifteen (15) days hereafter should any opposition be filed with regard to approval of this Cash Collateral Motion on a final basis.

## SUMMARY OF MATERIAL TERMS PURSUANT TO BANKRUPTCY RULE 4001

A.          **Summary of Proposed DIP Financing**

5.          As more fully set forth in the Colbert Certification and DIP Financing Documents attached as Exhibit A thereto,[2] Amboy Group has determined that a post-petition credit facility is needed to support its potential working capital needs as it attempts to reorganize.  To that end, Primary Capital has agreed to provide Amboy Group with a post-petition credit facility in the principal amount up to $500,000.00 (the "DIP Financing") as memorialized in the DIP Financing Documents.  The DIP Financing is to be disbursed to Amboy Group either in a lump sum or through a series of loans upon request by Amboy Group.  Any amount of the DIP Financing disbursed to Amboy Group shall accrue annual interest at the rate of 12 percent, and Amboy Group shall on the first day of each month repay Primary Capital an interest payment based on the then-outstanding principal balance of the DIP Financing, computed from the date of each disbursement. The entire principal balance of the DIP Financing, together with interest, shall be due and payable no later than October 31, 2018.

6.          In the event of default, the DIP Financing Documents provide various remedies to Primary Capital, including taking any action in law or equity to collect amounts due and to enter the Facility upon notice to Debtors to take possession of the DIP Financing Collateral (defined below), as more particularly set forth in the DIP Financing Documents.

7.          As a condition to providing the DIP Financing, Primary Capital requires that it be provided with a superpriority security interest in all of Amboy Group's "accessions, accounts, inventory, equipment, fixtures, books and records, chattel paper, documents, general intangibles, instruments, investment property, money, payment intangibles, promissory notes, securities,

---

[2] As set forth in the Colbert Certification, the DIP Financing Documents consist of a Grid Promissory Installment Note and accompanying Loan and Security Agreement executed by Amboy Group in favor of Primary Capital.

software, and supporting obligations as defined in the New Jersey Uniform Commercial Code (collectively, the "DIP Financing Collateral"). Primary Capital has indicated that it will not extend the DIP Financing without being provided a superpriority lien in the DIP Financing Collateral up to the amount of the DIP Financing. Given Newtek's (as defined in the Colbert Certification) existing first lien interests in the DIP Financing Collateral, it is necessary to obtain relief from the Court to "prime" Newtek's interest in the DIP Collateral such that Primary Capital be provided a first position superpriority lien. The DIP Financing Collateral will not affect any of the Debtors' other secured creditors, including VNB.

8.      Although priming is an extraordinary measure, it is necessary and reasonable in this instance, and it is believed that the benefit to the Debtors greatly outweighs any potential harm to Newtek.

**B.      Request for Approval of DIP Financing and Superpriority Lien**

9.      Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured creditor in the ordinary course of business, (b) obtaining unsecured credit outside of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. Pursuant to section 364(d), if a debtor is unable to obtain post-petition credit on an unsecured basis, the court may authorize the debtor to incur debt secured by a senior or equal lien on property of the estate that is already subject to a lien pursuant. In particular, section 364(d) provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
>> (A) the trustee is unable to obtain such credit otherwise; and
>>
>> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

> (2) In any hearing under this subsection, the trustee has the burden
> of proof on the issue of adequate protection.

10.    In essence, section 364(d)(1) authorizes a debtor-in-possession to incur superpriority senior secured or "priming" liens against already encumbered assets if the requisite factors are satisfied. *See Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991). Courts will evaluate the facts and circumstances of a debtor's case and afford significant weight to the necessity for obtaining the financing, as well as scrutinize the reasonableness and adequacy of the proposed financing terms under the circumstances. *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40-41 (Bankr. S.D.N.Y. 1990). In this vein, deference is typically given to a debtor-in-possession's business judgment when evaluating the necessity of the proposed protections to be extended in return for post-petition credit under section 364. *See Id.* at 38.

11.    To show that the credit required by a debtor-in-possession was not obtainable on an unsecured basis, the debtor-in-possession need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential Lender by section 364(c) and (d) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 at n. 4 (N.D. Ga. 1989); *Ames* 115 B.R. at 37-40. It has thus been observed that "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Snowshoe*, 789 F.2d at 1088; *see also In re Sky Valley, Inc.*, 1005 B.R. 107, 113 (Bankr. N.D. Ga. 1998) (finding that "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing" where the debtor "suffers some financial stress and has little or no unencumbered property"). Ultimately, a debtor-in-possession must only show that it made a "reasonable effort" to obtain financing from potential Lender on less stringent terms than a priming lien. *See Sun Trust Bank v. Den-Mark Constr., Inc. (In re Den-*

*Mark Constr., Inc.)*, 406 B.R. 683, 691 (E.D.N.C. 2009) (vacating a financing order of the bankruptcy court where record did not indicate that the debtor had contacted other financial institutions in the immediate geographic area, and it identified no specific investor or lending institution it approached other than the prepetition secured lender and the proposed post-petition lender).

12.    With respect to the adequate protection requirement of section 364(d)(1)(B), such is to be decided on a case-by-case basis, with the goal being "to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use by the debtor." *In re Satcon Tech.*, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (*citing In re Swedeland Dev., Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994)). "Whether protection is adequate depends directly on how effectively it compensates the secured creditor for loss of value caused by the superpriority given to the post-petition loan. In other words, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." *Swedeland*, 16 F.3d at 564 (internal citation omitted).

13.    Although the Bankruptcy Code does not explicitly define "adequate protection," examples of adequate protection are identified in section 361 and include, but are not limited to: (1) "periodic cash payments" to the extent that such use "results in a decrease in value of such entity's interest in the property;" (2) additional or replacement lien[s] to the extent that such ... use [of cash collateral] ... results in a decrease in the value of such entity's interest in such property;" and (3) "Granting such other relief ... will result in the realization by the entity of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361.

14.     As noted in the legislative history, bankruptcy courts have broad flexibility under

section 361 in determining what constitutes adequate protection:

> This section specifies the means by which adequate protection may
> be provided.  It does not require the court to provide it.  To do so
> would place the court in an administrative role.  Instead, the trustee
> or debtor in possession will provide or propose a protection method.
> If the party that is affected by the proposed action objects, the court
> will determine whether the protection provided is adequate.  The
> purpose of this section is to illustrate means by which it may be
> provided and to define the contours of the concept.

H.R. Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977).

15.     In the context of section 364(d)(1)(B), many courts have decided the issue by

determining whether there will be an equity cushion protecting the interests of the lender subject

to the priming. *See Aqua Assocs.*, 123 B.R. at 196 (surveying various decisions addressing whether

a lender is adequately protected by the equity cushion that would remain after priming).  Most

notably, the existence of an equity cushion "provides adequate protection if it is sufficiently large

to ensure that the secured creditor will be able to recover its entire debt from the security at the

completion of the case." *In re Elmire Litho, Inc.*, 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994); *see

also In re McKillips*, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987) ("Case law has established that the

existence of an equity cushion may in and of itself, constitute adequate protection for an over-

secured creditor.")

16.     When a court is determining whether to prime a lienholder, the debtor in possession

bears the burden of establishing that a lienholder is adequately protected.  11 U.S.C. § 364(d)(2).

In order to establish adequate protection, courts will analyze "all relevant facts 'with a particular

focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time,

the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the

Debtor's performance in accordance with the Plan.'" *YL W. 87th Holdings*, 423 B.R. at 442 (citing

*In re Tashjian*, 72 B.R. 968, 973 (Bankr. E.D. Pa. 1987)).

17.    It is well-settled that the existence of an equity cushion can be sufficient, in and of

itself, to constitute adequate protection. *In re AMR Corp.*, 490 B.R. 470, 478

(S.D.N.Y.,2013). Because this is a fact-sensitive inquiry, however, different courts have found

different sizes of the equity cushions sufficient to adequately protect a lienholder whose interest is

being primed. It is clear that if a sufficient equity cushion in collateral exists, a prepetition secured

creditor would not be impaired and it would be adequately protected. *See In re Phoenix Steel*

*Corp.*, 39 B.R. 218, 224 (D.Del. 1984). Generally, an equity cushion of 20% or more may be

found to be a sufficient amount to be adequate protection. *In re Mellor*, 734 F.2d 1396, 1401 (9th

Cir. 1984); *McKillips*, 81 B.R. at 458. Indeed, "case law almost uniformly concludes that: (1) an

equity cushion of twenty percent (20%) or more constitutes adequate protection; (2) an equity

cushion of less than eleven percent (11%) is insufficient; and (3) a range of twelve percent (12%)

to twenty percent (20%) has divided the Courts." *In re C.B.G. Ltd.*, 150 B.R. 570, 573

(Bkrtcy.M.D.Pa.,1992) (citing *McKillips*, 81 B.R. at 458).

18.    As noted in the Colbert Certification, the Debtors were unable to obtain an

acceptable post-petition credit facility from sources alternative to Primary Capital. Importantly,

although Primary Capital requires that it be given a superpriority claim on assets already subject

to liens held by Newtek, the terms are reasonable under the circumstances and Newtek is

adequately protected. In particular, the maximum $500,000.00 amount of the DIP Financing is

not overly burdensome to Newtek's interests, and the revolving credit nature of the terms provides

Amboy Group with the flexibility to obtain financing as needed depending on how its restructuring

efforts progress. Moreover, the Debtors and Primary Capital have a business history which has

fostered a level of familiarity and comfort, thereby removing uncertainties that may accompany dealings with an entity with little or no history.

19.    Newtek is also substantially adequately protected. The Facility is valued at $13 million and VNB is owed approximately $7.1 million on its first mortgage. Newtek holds a second and third mortgage and is owed approximate $3.5 million. Newtek enjoys a $2.3 million equity cushion. Moreover, Newtek is further protected by its first and second mortgages on the Usak Property, its various guarantees, and any security it would have in the DIP Collateral after Primary Capital's superpriority lien. Thus, even in a worst case scenario in which the Debtors' restructuring efforts fail and the Debtors are forced liquidate their assets, Newtek would still be fully compensated. Newtek is not be harmed by having its interest in the DIP Collateral primed by Primary Capital because it is fully secured through its other collateral. Further, the Debtors purpose to pay Newték a $14,583.33 monthly adequate protection payment based on debt of $3.5 million amortized over twenty- five (25) years at five percent (5%).

20.    Based on the foregoing, it is respectfully requested the Court enter an order authorizing Amboy Group to obtain the DIP Financing from Primary Capital and providing Primary Capital with a superpriority lien on the DIP Collateral as necessary implements for the Debtors' restructuring process.

21.    Pursuant to Bankruptcy Rules 4001(b) and (d), the principal provisions of the DIP Credit Facility and Interim Cash Collateral Order are as follows (capitalized terms used but not immediately defined herein shall have the meanings ascribed to them later in this Cash Collateral Motion, or in the Interim Cash Collateral Order, as the case may be):

## JURISDICTION AND VENUE

22.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(M), (A) and (O).

23.    Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

24.    The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105, 361, 362 and 363, and Federal Rule of Bankruptcy Procedure 4001.

## BACKGROUND

25.    On October 25, 2017 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"). The Debtors continue to operate their businesses and property as a debtors-in-possession in accordance with Sections 1107 and 1108 of the Bankruptcy Code. To date, no trustee, examiner or creditors' committee has been appointed in this chapter 11 case.

26.    The factual background relating to the commencement of this chapter 11 case is set forth in detail in the Colbert and McNamara certifications, which are incorporated herein by reference.

27.    As set forth more fully in the Certifications, the Debtors were formed under the laws of the State of New Jersey. CLU Amboy is a single asset real estate holding company of commercial property located at 1 Amboy Avenue, Woodbridge, NJ 07095 (the "Facility"). CLU Amboy currently leases the property to an affiliate, also a Debtor, Amboy Group as well as other unrelated entities.

28.    When CLU Amboy took possession of the Facility, it was in worse disrepair than initially thought, thereby requiring more time and capital to renovate than originally anticipated.

The resulting delay and cost in the renovations resulted in Amboy Group's significant delay in beginning operations, generating income, and remitting rent to CLU Amboy, which caused a snowball effect that is still impacting the Debtor today.  An additional cause of the reduced revenues of the Debtors is operational inefficiencies that can be and will be addressed through the bankruptcy.

29.    To address these operational inefficiencies and to attempt to reorganize through these chapter 11 cases, the Debtors need working capital.  To that end, Primary Capital, an unsecured prepetition lender to Debtors, has agreed to provide Amboy Group with a post-petition DIP Credit Facility in the principal amount of $500,000.00 as memorialized in the DIP Financing Documents.  The DIP Financing is to be disbursed to Amboy Group either in a lump sum or through a series of loans upon request by Amboy Group.  Any amount of the DIP Financing disbursed to Amboy Group shall accrue annual interest at the rate of 12%, and Amboy Group shall on the first day of each month repay Primary Capital an interest only payment based on the then-outstanding principal balance of the DIP Financing, computed from the date of each disbursement. The entire principal balance of the DIP Financing, together with interest, shall be due and payable no later than October 31, 2018.

30.    In the event of default, the DIP Financing Documents provide various remedies to Primary Capital, including taking any action in law or equity to collect amounts due and to enter the Facility, upon written notice to take possession of the DIP Financing Collateral (defined below), as more particularly set forth in the DIP Financing Documents.

31.    As a condition to providing the DIP Financing, Primary Capital requires that it be provided with a senior security interest in all of Amboy Group's "accessions, accounts, inventory, equipment, fixtures, books and records, chattel paper, documents, general intangibles, instruments,

investment property, money, payment intangibles, promissory notes, securities, software, and supporting obligations as defined in the New Jersey Uniform Commercial Code (collectively, the "DIP Financing Collateral"). Primary Capital has indicated that it will not extend the DIP Financing without being provided a senior lien in the DIP Financing Collateral up to the amount of the DIP Financing of $500,000.

32.     Because Newtek has a first lien on the receivables in the DIP Financing Collateral, it is necessary to obtain relief from the Court to "prime" Newtek's interest in the DIP Financing Collateral to provide a first position senior secured lien to the DIP Lender. The DIP Financing will not affect any of the Debtors' other secured creditors, including VNB.

33.     Although priming is an extraordinary measure, it is necessary and reasonable in this instance, and it is believed that the benefit to the Debtors greatly outweighs any potential harm to Newtek.

A.      **The Debtors' Loan Agreements with Valley National Bank**

34.     On December 27, 2013, CLU Amboy and Valley National Bank ("VNB") entered into that certain Mortgage and Security Agreement and Promissory Note (the "VNB Loan Documents") in connection with an adjustable rate term loan in the original principal amount of $6,500,000.00 (the "VNB Term Loan"). Pursuant to the VNB Loan Documents, the Note was for a twenty-five (25) year term.

35.     The VNB Term Loan is secured by a first mortgage (the "VNB First Mortgage") on the property commonly known as 1 Amboy Avenue, Woodbridge, New Jersey, (the "Facility"). To further secure the VNB Term Loan, CLU assigned its rents to VNB (the "Assignment"). As part of the Assignment, VNB provided CLU a license to collect rents that would terminate upon CLU defaulting on the VNB Term Loan. Amboy Group has not paid rent in several months.

36.     The VNB Loan Documents contain a "Subordinated Indebtedness" clause whereby, pursuant to a separate Subordination Agreement between CLU and Newtek, any debts owed by CLU to its officers, directors, shareholders, members, guarantors, or partners, are subordinated to the repayment of all sums advanced to CLU by VNB.

37.     As of the Petition Date, VNB asserts that approximately $7,154,281.28 remained due and owing on the VNB Term Loan. The Debtors propose to pay VNB $30,000, as adequate protection, which is based on a twenty-five (25) year amortization at five percent (5%).

**B.     The Debtors' Loan Agreements with Newtek Small Business Finance, Inc.**

**1.     The First Newtek Small Business Finance, Inc. Loan**

38.     On December 27, 2013, the Debtors and Newtek Small Business Finance, Inc. ("Newtek") entered into that certain Promissory Note, Loan Agreement, Mortgage and Security Agreement, and General Security Agreement (the "Loan Documents") in connection with an adjustable rate term loan in the original principal amount of $2,625,000.00 (the "First Newtek Term Loan"). Pursuant to the First Newtek Term Loan Documents, the maturity date on the First Newtek Term Loan is December 27, 2023.

39.     The First Newtek Term Loan is secured by a second mortgage ("Second Mortgage"), subject only to VNB's First Mortgage on the Facility, together with improvements, and assignment of rent. The First Newtek Term loan is further secured by individual guarantees by each of CLU Amboy's three members (the "Newtek Member Guarantors"), as well as a first perfected security interest on substantially all of Debtors' personal property (the "Personal Property") and, with the Second Mortgage and Newtek Member Guarantors (the "First Newtek Loan Collateral").

40.     As of August 29, 2017, Newtek asserts that approximately $1,947,067.47 remains due and owing on the First Newtek Term Loan.

41.     Newtek's Collateral includes its liens on cash collateral (the "Cash Collateral") that the Debtors receive from various respective sources.

**2.      The Second Newtek Small Business Finance, Inc. Loan**

42.     On June 3, 2015, the Debtor and Newtek entered into that certain Loan Agreement in connection with an adjustable rate installment loan in the original principal amount of $1,816,00.00 (the "Second Newtek Term Loan"). Pursuant to the Second Newtek Term Loan Agreement, the loan was to be paid out in one (1) monthly installment of interest only and 119 equal consecutive monthly installments of principal and interest.

43.     The Second Newtek Term Loan is secured by, among other things, a third mortgage on the Facility (the "Third Mortgage"), as well as a subordinated priority interest on all of the Debtors' business assets (the "Business Assets") as defined in the General Security Agreement (the "Second Newtek Loan Collateral").

44.     The Second Newtek Loan Agreement contains a "Cross Collateralization" clause whereby, pursuant to a separate Cross-Collateralization and Cross Default Agreement, any default or event of default by CLU Amboy in the terms of the First or Second Newtek Term Loan, shall constitute a default under both the First and Second Newtek Term Loans. Further, any collateral pledged by CLU Amboy securing the First Newtek Term Loan shall secure all obligations under the Second Newtek Term Loan, and vice-versa.

45.     As of August 29, 2017, Newtek asserts that approximately $1,549,555.45 remains due and owing on the Second Newtek Term Loan. Thus, the Debtors owe Newtek approximately $3,500,000.

46.    Newtek's Collateral includes its liens on cash collateral (the "Cash Collateral") that the Debtors receive from various respective sources. To adequately secure Newtek, the Debtors propose to pay an interest only monthly adequate protection payment of $14,583.33.[3]

**C.    Events Leading to Bankruptcy**

47.    As noted, when CLU Amboy took possession of the Facility, it was in significant disrepair than had been initially thought, thereby requiring more time and capital to renovate than originally anticipated. The resulting delay in Amboy Group moving into the Facility, beginning operations and generating income caused a snowball effect which is still impacting the Debtors. In particular, the lack of initial revenue resulted in Amboy Group defaulting on the VNB Term Loan. VNB then revisited the terms of the VNB Term Loan and required CLU Amboy and the Guarantors into surrendering their rights to VNB with respect to the amounts owed to VNB and the additional collateral of the Guarantors requested by VNB. Additionally, the Debtors suffered certain inefficiencies in operations, which were at least partly due to expanding its workforce too quickly and beyond its capabilities. Debtors have addressed the inefficiency issues, including trimming the Amboy Group workforce down from 142 employees at the end of 2017 to the present 64, a reduction of nearly 50 percent.

48.    Despite these issues requiring restructuring through these chapter 11 cases, Debtors' revenues have increased each of the last three years. The Facility, particularly the cold storage component, is state of the art and with easy access to the Port of Newark. The Facility's cold storage capabilities and location have a natural appeal to entities seeking to transport and store perishable items, and it is believed that these businesses will grow significantly.

---

[3] Calculation based on twenty-five (25) years amortization of $3,500,000 at five percent interest.

49.    The Debtors' bankruptcy filings were done in order to provide an opportunity for the debtors to restructure their debt and operations so as to become more economical and maximize income potential from businesses with clear growth potential.

## RELIEF REQUESTED

50.    The Debtors anticipate the need for the DIP Financing as well as use of Cash Collateral during the course of administration of this chapter 11 case in order to meet their post-petition obligations and reorganize.  Through this Motion, the Debtors respectfully seek an order, pursuant to Bankruptcy Code §§ 105(a), 361, 362, 363, and 364(d) and Bankruptcy Rules 2002, 4001 and 9014:

a)  Approving on an emergency interim basis, the terms of the DIP Financing (as set forth in the DIP Financing Documents) and conditions pursuant to which the Debtors shall be entitled to use Cash Collateral and other relief as described in the Interim Order and Budget attached (the "Budget") through the date of the Final Hearing (which the Debtors request be set for on or before November , 2017).  A true copy of the Budget is attached as **Exhibit "A"**, and incorporated by reference herein;

b)  Approving the form and manner of service of notice of this Motion;

c)  Scheduling a final hearing to consider entry of the Final Order granting the relief sought herein on a permanent basis (the "Final Hearing") no sooner than fifteen (15) days after the hearing on this Motion;

d)  Approving the form and manner of providing notice of the Final Hearing; and

e)  Granting such other and further relief as the Court deems just and proper.

51.     Approval of the Debtors' authority to incur the DIP Financing and use Cash Collateral on an interim basis pending the Final Hearing is necessary to prevent irreparable harm to provide the Debtors immediate use of funds, which will allow the Debtor to pay essential operating costs, including allowing the continuation of employment of 64 employees.   The Debtors' immediate cash needs, for which they seek authorization, arise by virtue of its need to pay post-petition obligations critical to the continued operation of Debtors' businesses, such as continuing the manufacturing, packaging, and selling of meat products; the continued employment of Debtors' personnel; and maintaining insurance, property taxes, and upkeep of the Facility. Absent the authority for the DIP Financing and to use Cash Collateral, the Debtor will be unable to pay for the services that are essential to the maintenance of their operations and necessary to preserve its assets and property (including the Prepetition Collateral) during this case, and will avoid immediate and irreparable harm to the Debtors' estate and its creditors, including the Prepetition Lender.   The authority to use Cash Collateral will provide the Debtors with liquidity to manage their businesses.   Accordingly, use of Cash Collateral is crucial.

## ARGUMENT

### A.     Request for Approval of DIP Financing and Senior Lien

52.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside of the ordinary course of business, and (c) obtaining credit with specialized priority or with security.   Pursuant to section 364(d), if a debtor is unable to obtain post-petition credit on an unsecured basis, the court may authorize the debtor to incur debt secured by a senior or equal lien on property of the estate that is already subject to a lien pursuant.   In particular, section 364(d) provides:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

53.    In essence, section 364(d)(1) authorizes a debtor-in-possession to incur superpriority senior secured or "priming" liens against already encumbered assets if the requisite factors are satisfied. *See Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991). Courts will evaluate the facts and circumstances of a debtor's case and afford significant weight to the necessity for obtaining the financing, as well as scrutinize the reasonableness and adequacy of the proposed financing terms under the circumstances. *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40-41 (Bankr. S.D.N.Y. 1990). In this vein, deference is typically given to a debtor-in-possession's business judgment when evaluating the necessity of the proposed protections to be extended in return for post-petition credit under section 364. *See Id.* at 38.

54.    To show that the credit required by a debtor-in-possession was not obtainable on an unsecured basis, the debtor-in-possession need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential Lender by section 364(c) and (d) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99

B.R. 117, 120 at n. 4 (N.D. Ga. 1989); *Ames* 115 B.R. at 37-40. It has thus been observed that

"[t]he statute imposes no duty to seek credit from every possible lender before concluding that

such credit is unavailable." *Snowshoe*, 789 F.2d at 1088; *see also In re Sky Valley, Inc.*, 1005 B.R.

107, 113 (Bankr. N.D. Ga. 1998) (finding that "it would be unrealistic and unnecessary to require

[the debtor] to conduct such an exhaustive search for financing" where the debtor "suffers some

financial stress and has little or no unencumbered property").

55.    With respect to the adequate protection requirement of section 364(d)(1)(B), such

is to be decided on a case-by-case basis, with the goal being "to protect a secured creditor from

diminution in the value of its interest in the particular collateral during the period of use by the

debtor." *In re Satcon Tech.*, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (citing *In re

Swedeland Dev., Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994)).

56.    Although the Bankruptcy Code does not explicitly define "adequate protection,"

examples of adequate protection are identified in section 361 and include, but are not limited to:

(1) "periodic cash payments" to the extent that such use "results in a decrease in value of such

entity's interest in the property;" (2) additional or replacement lien[s] to the extent that such …

use [of cash collateral] … results in a decrease in the value of such entity's interest in such

property;" and (3) "Granting such other relief … will result in the realization by the entity of the

indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361.

57.    As noted in the legislative history, bankruptcy courts have broad flexibility under

section 361 in determining what constitutes adequate protection:

> This section specifies the means by which adequate
> protection may be provided. It does not require the court to
> provide it.    To do so would place the court in an
> administrative role.    Instead, the trustee or debtor in
> possession will provide or propose a protection method. If
> the party that is affected by the proposed action objects, the

> court will determine whether the protection provided is
> adequate. The purpose of this section is to illustrate means
> by which it may be provided and to define the contours of
> the concept.

H.R. Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977).

58.    In the context of section 364(d)(1)(B), many courts have decided the issue by determining whether there will be an equity cushion protecting the interests of the lender subject to the priming. *See Aqua Assocs.*, 123 B.R. at 196 (surveying various decisions addressing whether a lender is adequately protected by the equity cushion that would remain after priming). Most notably, the existence of an equity cushion "provides adequate protection if it is sufficiently large to ensure that the secured creditor will be able to recover its entire debt from the security at the completion of the case." *In re Elmire Litho, Inc.*, 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994); *see also In re McKillips*, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987) ("Case law has established that the existence of an equity cushion may in and of itself, constitute adequate protection for an over-secured creditor.")

59.    As noted in the Colbert Certification, the Debtors were unable to obtain post-petition credit facility from sources alternative to Primary Capital. Importantly, although Primary Capital requires that it be given a superpriority claim on assets already subject to liens held by Newtek, the terms are reasonable under the circumstances. In particular, the maximum $500,000.00 amount of the DIP Financing is not overly burdensome to Newtek's interests, and the revolving credit nature of the terms provides Amboy Group with the flexibility to obtain financing as needed depending on how its restructuring efforts progress. Moreover, the Debtors and Primary Capital have a business history which has fostered a level of familiarity and comfort, thereby removing uncertainties that may accompany dealings with an entity with little or no history.

60. Newtek is also substantially adequately protected. More specifically, even after VNB's $7,100,000 first mortgage on the Facility there is approximately $2.3 million in an equity cushion above Newtek's second and third mortgages (collectively, totaling $3,600,000) on the Facility. Moreover, Newtek is further protected by its first and second mortgages on the Usak Property, its various guarantees, and any security it would have in the DIP Collateral after Primary Capital's superpriority lien. Thus, even in a worst case scenario in which the Debtors' restructuring efforts fail and the Debtors are forced liquidate their assets, Newtek would still be fully compensated. Further, the Debtors propose a monthly adequate protection payment to Newtek. Newtek would therefore not be harmed by having its interest in the DIP Collateral primed by Primary Capital because it is fully secured through its other collateral.

61. Based on the foregoing, it is respectfully requested the Court enter an order authorizing Amboy Group to obtain the DIP Financing from Primary Capital and providing Primary Capital with a superpriority lien on the DIP Collateral as necessary implements for the Debtors' restructuring process.

**B.    The Proposed Use Of Cash Collateral Is Appropriate And Should Be Authorized**

62. Section 363(c)(2) of the Bankruptcy Code sets forth the requirements for a debtor's proposed use of cash collateral, and, in pertinent part, provides that:

> [t]he trustee may not use, sell, or lease cash collateral … unless –
> (A) each entity that has an interest in such cash collateral consents;
> or (B) the court, after notice and a hearing, authorizes such use, sale,
> or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).[4]

---

[4] Section 363(a) of the Bankruptcy Code defines "cash collateral" as:

> [C]ash, negotiable instruments, documents of title, securities, deposit accounts, or
> other cash equivalents whenever acquired in which the estate and an entity other
> than the estate have an interest and includes the proceeds, products, offspring,

63.    Section 105(a) of the Bankruptcy Code also allows that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  The Debtors respectfully submit that the proposed use of Cash Collateral is necessary to preserve its assets and property (including the Prepetition Collateral) during this case, and will avoid immediate and irreparable harm to the Debtors' estate and creditors, including the Prepetition Lender.  Such use prejudices no one; it affirmatively and directly benefits the estate and creditors by enhancing the prospects of a successful outcome of this case.

C.    **The Proposed Adequate Protection Is Appropriate**

64.    Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee [or debtor in possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  Examples of adequate protection are provided in section 361 of the Bankruptcy Code and include, but are not limited to:  (1) "periodic cash payments" to the extent that such use "results in a decrease in value of such entity's interest in the property;" (2) "additional or replacement lien[s] to the extent that the use [of cash collateral] will cause a decrease in the value of such entity's interest in the property;" and (3) "granting such other relief ... as results in the realization by the entity of the indubitable equivalent of such entity's interest in the property." 11 U.S.C. § 361.  Bankruptcy courts have broad flexibility under section 361 in deciding what constitutes adequate protection:

---

rents, or profits of property . . . subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title[.]

11 U.S.C. § 363(a).

> This section specifies the means by which adequate protection may be provided. It does not require the court to provide it. To do so would place the court in an administrative role. Instead, the trustee or debtor in possession will provide or propose a protection method. If the party that is affected by the proposed action objects, the court will determine whether the protection provided is adequate. The purpose of this section is to illustrate means by which it may be provided and to define the contours of the concept.

H.R. Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977); *see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.),* 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis.").

65.    The principle purpose of adequate protection is to safeguard the interest of the secured creditor in the particular collateral *against diminution in the value* of such interest. *See, In re Swedeland Dev. Group, Inc.,* 16 F.3d at 564 ("[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (quoting *In re O'Connor,* 808 F.2d 1393, 1396 (10th Cir. 1987)) (emphasis added); *accord In re DeSardi,* 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006) ("The purpose of adequate protection is to assure that the lender's economic position is not worsened because of the bankruptcy case."); *In re Hollins,* 185 B.R. 523, 528 (Bankr. N.D. Tex. 1995) ("Adequate protection seeks to protect a creditor from an [sic] decline in the value of its collateral . . . ."). Thus, the use of a secured creditor's cash collateral is conditioned upon either the consent of the secured creditor and/or the provision of adequate protection to the secured creditor by the Debtor.

66.    The Debtor, however, is mindful that the "Court is not obligated to protect the creditor better than it did itself when making the loan and obtaining security." *In re Heatron, Inc.,* 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980). The interest to be protected by virtue of the adequate protection requirement is the lesser of the amount of the debt or the value of assets securing the debt as of the Petition Date. *See In re Alyucan Interstate Corp.,* 12 B.R. 803, 808 (Bankr. D. Utah

1981) ("[T]he 'interest in property' entitled to protection is not measured by the amount of the debt but by the value of the lien.").

67.    The Debtors believe that the Prepetition Lender is fully secured, as the value of the Debtors' assets is substantially higher than the amount of Prepetition Lender's claim. Moreover, the post-petition generation of accounts receivable and cash by the Amboy Group will be in excess of the amounts used by the Debtor pursuant to its Budget. In addition, as adequate protection, Debtor will make monthly payments to Newtek. Thus, Newtek's Cash Collateral is not diminishing in value and Newtek is adequately protected.

68.    Additional adequate protection for the Prepetition Lender is the use of Cash Collateral in accordance with the Budget (subject to permitted variances). Essentially, the Budget provides for expenditures to fund the Debtors' reduced, but necessary and essential, day-to-day operations. Such expenditures include payments required to maintain post-petition payments to vendors, and payments to maintain the condition of the property.

69.    Courts have routinely held that adequate protection may be demonstrated by a showing that the going concern value of the debtor, or the value of the lender's collateral, is preserved by the debtor's continuing operations and use of cash collateral. *See, e.g., In re JKJ Chevrolet, Inc.,* 117 F.3d 1413, 1413 (4th Cir. 1997) (allowing use of cash collateral to operate automobile dealership as long as continued operations maintained the value of the business); *In re Snowshoe Co., Inc.,* 789 F.2d 1085, 1087 (4th Cir. 1986) (allowing use of cash collateral to operate ski resorts where trustee reported that ski resort would lose 50% to 90% of its fair market value if it ceased operations); *In re 499 W. Warren St. Assocs., Ltd. P'ship,* 142 B.R. 53, 56-57 (Bankr. N.D.N.Y. 1992) (finding secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on collateral property);

*In re Constable Plaza Assocs., L.P.,* 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (holding that the debtor was entitled to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral).

70.    Here, the proposed cash expenditures are necessary to preserve and maintain the value of the prepetition collateral and the interests therein of the Prepetition Lender. Moreover, use of the Cash Collateral in the manner and for the purposes proposed will maintain the overall value of the Debtors' ongoing enterprise and enhance the chances of a successful outcome for this case. If the Debtors are precluded from making expenditures necessary to maintain the Debtors' assets, or if the Debtors are forced to effect a "fire-sale" liquidation of their assets, the Prepetition Lender, indeed all creditors—secured and unsecured—will be harmed. *See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (citing *In re Grant Broad. of Philadelphia, Inc.*, 71 B.R. 376, 386-89 (Bankr. E.D. Pa. 1987), *aff'd*, 75 B.R. 819 (E.D. Pa. 1987), and *In re Alyucan Interstate Corp.*, 12 B.R. at 809-12)). Further, the employees will be out of work as we approach the holiday season in a very difficult employment environment.

71.    As additional adequate protection, the Interim Order also provides adequate protection to the Prepetition Lender in the form of (i) replacement liens on and security interests in (the "Adequate Protection Liens") all of the Debtors' property and assets (whether existing on the Petition Date or acquired or arising thereafter), and proceeds thereof, *see* 11 U.S.C. § 361(2) (providing for replacement liens as a form of adequate protection)), other than the post-petition account receivables; and (ii) allowed superpriority claims pursuant to section 507(b) of the Bankruptcy Code, senior to all other administrative claims, except as set forth below. Such

adequate protection is commonplace. *See, e.g., MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-98 (10th Cir. 1987) (allowing the debtor to replace a lien on cash with a lien on property likely to be worth five times as much); *In re Center Wholesale, Inc.*, 759 F.2d 1440, 1450 (9th Cir. 1985) (observing that a lien on additional property of the debtor would likely constitute adequate protection for the secured creditor).

72.     If the Debtors utilize the Cash Collateral of the Prepetition Lender and such use results in the diminution in the value of the Prepetition Lender's Cash Collateral, the Prepetition Lender is adequately protected by (i) the actual value of the Debtors' property on which it asserts liens (in which there is a substantial equity cushion), and (ii) the granting of the Adequate Protection Liens.

## NOTICE IS SUFFICIENT UNDER THE CIRCUMSTANCES

73.     The Debtors submit that given the exigencies of the situation, the timing of the filing, and the Debtors' immediate need for funds, expedited notice as contemplated by Bankruptcy Rule 4001 is sufficient to permit this Court to enter an interim order authorizing Debtors' DIP Financing and use of Cash Collateral. The Debtors will provide notice of the Interim Hearing to: (i) the Office of the United States Trustee, (ii) the Debtors' twenty (20) largest unsecured creditors, (iii) Prepetition Lender, (iv) counsel for VNB, (v) Debtors' other Secured Creditors, if any, (vi) the DIP Lender and its counsel, and (vii) all other persons and entities that have requested notice pursuant to Fed. R. Bankr. P. 2002.

74.     The Debtors submit that no other or further notice is necessary.

## NOTICE WITH RESPECT TO FINAL ORDER

75.     Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that they be authorized to provide notice of the Final Hearing on this Motion by serving a copy of the Motion

(to the extent not previously served), together with the Interim Order, in accordance with the terms provided in the Interim Order.

## NO PREVIOUS RELIEF REQUESTED

76.     The Debtors have not previously sought the relief requested herein from this Court or any other court.

## EXPEDITED RELIEF

77.     Due to the exigent circumstances of this case, the Debtors have filed contemporaneously herewith a motion requesting the Court enter an order scheduling an expedited hearing and shortening time (the "Motion to Expedite") on the relief requested herein with a hearing on the Motion on October 27, 2017, or that the Court schedule a hearing on the Motion at its earliest convenience.

**WHEREFORE,** the Debtors respectfully requests that the Court (i) grant the Motion, (ii) enter the Interim Order, substantially in the form attached hereto, granting the relief requested; (iii) set the Final Hearing; and (iv) grant such other and further relief as is just and proper.

Respectfully submitted,
**TRENK, DiPASQUALE,**
**DELLA FERA & SODONO, P.C.**
*Attorneys for the Debtor and*
*Debtor-In-Possession*

Dated: October 25, 2017

    /s/ Anthony Sodono, III
Anthony Sodono, III
Sari B. Placona

4828-8211-1058, v. 1