| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>Caption in Compliance with D.N.J. LBR 9004-1(b)<br><br>**TRENK DiPASQUALE**<br>**DELLA FERA & SODONO, P.C.**<br>347 Mount Pleasant Avenue – Suite 300<br>West Orange, New Jersey 07052<br>(973) 243-8600<br>Anthony Sodono, III<br>Sari B. Placona<br>*Counsel to Amboy Group, LLC, et. al.,*<br>*Chapter 11 Debtors and Debtors-in-Possession* | |
| In Re:<br><br>AMBOY GROUP, LLC, et. al,[1]<br><br>Debtors. | Case No. 17-31653<br>(Joint Administration Pending)<br><br>Judge: Christine M. Gravelle<br><br>Chapter 11<br><br>**Hearing Date: TBD**<br>**Obj. Deadline: TBD** |

## CERTIFICATION OF WILLIAM COLBERT
## IN SUPPORT OF FIRST DAY APPLICATIONS AND MOTIONS

I, William Colbert, of full age, hereby certify as follows:

1. I am the Managing Member of CLU Amboy, LLC ("CLU Amboy") and Amboy Group, LLC ("Amboy Group," and together with CLU Amboy, the "Debtors"), and in that capacity, I am familiar with the Debtors' day-to-day operations and financial affairs, and submit this Certification (the "Certification") in support of the first day applications and motions (the "First Day Motions") filed in the Debtors' respective chapter 11 bankruptcy cases.

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are: (i) Amboy Group, LLC (8971) and (ii) CLU Amboy, LLC (5726).

51390434.v3

2. On October 25, 2017 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of title of 11 of the United States Code, 11 U.S.C. § 101, *et. seq.* (the "Bankruptcy Code"). Each of the Debtors are operating their business and managing their property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. This Certification, in conjunction with the Certification of Amboy Group's Controller, Logan McNamara (the "McNamara Certification"), is intended to provide the Court and parties-in-interest with an understanding of the Debtors' businesses and the circumstances that precipitated the Debtors' bankruptcy filings, as well as to support various First Day Motions that have been filed in connection with the Debtors' bankruptcy filings. The First Day Motions are necessary to facilitate an orderly and effective transition into Chapter 11 while minimizing the disruption to the Debtors' business operations. The Debtors have all appropriate insurance in place. See **Exhibit A** for insurance declarations.

4. Unless otherwise stated, all facts set forth herein are based on my personal knowledge, my review of relevant documentation, information provided to me by the Debtors' employees and professionals, or my opinion based on my experience and knowledge with respect to the operations and financial affairs of the Debtors.

5. This Certification is divided into three sections: The first section provides background on the Debtors' businesses and financial conditions; the second section addresses the Debtors' proposed post-petition financing; and the third section sets forth relevant facts in support of the First Day Motions and is intended to supplement any certifications submitted in direct support of any of the First Day Motions.

2

### I. Background

#### A. The Debtors' Businesses

##### 1) Amboy Group

6. Amboy Group was incorporated in New Jersey on or about October 1, 2013. It operates a food processing and storage facility located at 1 Amboy Avenue, Woodbridge, New Jersey 07095 (the "Facility"), and specializes in manufacturing and distributing Irish and Italian meat products throughout the United States. In addition to Amboy Group, the business utilizes the tradenames Agnelli's Gourmet and Tommy Moloney's.

7. Prior to its incorporation, a predecessor of Amboy Group, Tommy Moloney's, Inc. ("Tommy Moloney's"), operated for several years in Queens, New York. Given the unique benefits offered by the Facility, including its operations history, size, and location, Amboy Group decided to move its operations to the Facility and rebrand. As part of this process, Amboy Group assumed all of Tommy Moloney's assets and liabilities, and still utilizes the tradename.

8. I hold a 33.75% interest in Amboy Group and am one of six members of the company. The other five members and their interests are: Thomas Lambert (33.75%), Paul Usak (26.68%), Dan Butterini (2.26%), William Kaiser (2.26%), and Donard Gaynor (1.30%).

9. As of the Petition Date, Amboy Group has approximately sixty (63) employees. Amboy Group offers a minimum essential coverage health insurance plan to all of its full-time employees who have accrued enough time with the company.[2] Amboy Group does not have a 401k retirement plan for its employees. Amboy Group also maintains a worker's compensation

---

[2] Employees become eligible for health insurance on the first day of the first month after being employed for three (3) full months with Amboy Group.

3

insurance policy. As more fully set forth in the First Day Motions, to facilitate the operation of its business, Amboy Group requires that its current workforce to remain in place throughout the pendency of its chapter 11 case, and that employees continue to receive compensation and health insurance coverage. Amboy Group operates with a critical number of employees and it cannot risk a reduction in workforce or a decline in Employee morale. Additional details about Amboy Group's employees are in the McNamara Certification.

10. Amboy Group's tangible assets consist of various food preparation, refrigeration, and storage equipment, as well as office equipment, as more particularly set forth in the schedules, which will be timely filed. Amboy Group also leases various equipment and those leases will also be set forth in Amboy Group's schedules.

11. Amboy Group's gross revenue and net income for each year since 2015 is as follows:

|  | **2015** | **2016** | **2017 (as of 8/30/17)**[3] |
| --- | --- | --- | --- |
| Gross Revenue | $6,262,666.00 | $10,012,551.00 | $8,567,501.76 |
| Net Income | (1,848,846.00) | (1,124,085.00) | ($701,803.23) |

12. Amboy Group also holds a 51% interest in an American entity known as Parmacotto-Amboy NA, LLC ("Parmacotto-Amboy"), that distributes Italian meats. The remaining 49% is owned by an American entity known as Parmacotto America. Parmacotto America is owned by Paramcotto sPa. Parmacotto sPa[4] has been subject to insolvency proceedings

---

[3] The figures for 2015 and 2016 were reported in Amboy Group's tax returns for those years, while the 2017 figures are based on internal accountings through September 30, 2017.

[4] It is anticipated that Parmacotto America will emerge from bankruptcy shortly and will be beneficial towards Amboy Group's reorganization..

4

in Italy for approximately two and half years, during which time, no revenue has flowed from Parmacotto sPa to Amboy Group.

### 2) CLU Amboy and the Facility

13. CLU Amboy was incorporated in New Jersey on September 30, 2013. CLU Amboy owns the Facility, which is its sole tangible asset. CLU Amboy also uses the trade name Amboy Cold Storage. All of CLU Amboy's income is derived from leases and contract service agreements for storage space at the facility.

14. I hold a 33.40% interest in CLU Amboy and I am one of three (3) members of the company. The other two members and their interests are as follows: Thomas Lambert (33.30%) and Paul Usak (33.30%). As noted above, both Thomas Lambert and Paul Usak are also members of Amboy Group. Accordingly, Amboy Group and CLU Amboy are affiliated entities pursuant to 11 U.S.C. § 101(2). CLU Amboy presently has no employees.

15. CLU Amboy owns the Facility, which it acquired in December 2013 in a foreclosure sale from Valley National Bank. As part of the sale, CLU Amboy agreed to assume the existing mortgage.

16. The Facility at one time served as the headquarters for Haagen-Dazs ice cream and contains approximately 110,000 square feet of space. A seven-story freezer holding over 1,000,000 cubic feet of space occupies approximately 20,000 square feet of the Facility. The rest of the floor space is dedicated to Amboy Group's food processing operations, including discrete areas for processing, maintenance, dry storage, and office space.

17. Due to the extensive renovations that were required for its intended use, CLU Amboy did not take possession of the Facility until January 2014. The Facility had been vacant

for at least three (3) years prior to its acquisition by CLU Amboy and required a significant amount of renovation, far beyond what was anticipated at the time of purchase as measured in both time and cost. The renovations took approximately eighteen (18) months to complete, during which time Amboy Group was unable to commence operations at the Facility. Prior to operating at the Facility, the Debtors operated as Tommy Moloney's in Queens, New York.

18.  Pursuant to an appraisal performed by Anthony F. Lama Realty Services, Inc., dated June 26, 2017, the Facility is valued at $13,000,000.00.

19.  Amboy Group operates its business at the Facility pursuant to a commercial lease entered into with CLU Amboy as landlord.

20.  CLU Amboy also has a lease with Verizon, which maintains a tower on the roof of the Facility for which it pays annual rent of $8,000.00 to CLU Amboy.

21.  CLU Amboy, through its tradename Amboy Cold Storage, also has contractual pricing agreements with several customers for storage of their products in CLU Amboy's temperature controlled storage facilities. The income received by CLU Amboy by its customer agreements is subject to fixed rates set forth in the respective service agreement and varies depending on the quantity of goods stored by customer at the Facility at a given time. The most notable of these agreements is with Blue Apron, LLC ("Blue Apron"), the term of which ends on December 31, 2018 and the contracted pricing can be automatically renewed by Blue Apron for one year. For the period January 1, 2017 through October 16, 2017, CLU Amboy has received approximately $493,454.00 from Blue Apron, and approximately $115,498.78 from other customers with storage agreements.

22. As noted, CLU Amboy's income is exclusively generated from the rental and storage payments it receives. CLU Amboy's gross rents and net income from customers for each year since 2015, including rent received from Amboy Group, is as follows:

|  | **2015** | **2016** | **2017**[5] |
|---|---|---|---|
| Gross Revenue | $644,066.00 | $624,444.00 | $1,052,833.75 |
| Net Income | ($84,299.00) | ($143,838.00) |  |

23. The growth in CLU Amboy's income in 2017 is attributable to increased revenue from renting cold storage space to customers, more specifically Blue Apron. Given the size of the Facility and its geographic proximity to the Port of Newark, it is believed that CLU Amboy has significant untapped growth potential in renting storage space.

### B. The Valley National Bank Loan and Related Litigation

24. In connection with its purchase of the Facility, CLU Amboy obtained a loan from Valley National Bank ("VNB") in the principal amount of $6,500,000.00 with an initial interest of 5% for the first five (5) years, as memorialized in a promissory note (the "VNB Note") dated December 27, 2013. The VNB Note was for a twenty-five (25) year term, and required CLU Amboy to remit monthly payments of principal and interest in the amount of $38,270.55. The VNB Note was secured by a mortgage on the Facility and was personally guaranteed by Amboy Group and each of the three members of CLU Amboy (the "Guarantors"). Additionally, VNB was given an assignment of rents, under which CLU Amboy was provided a license to collect rents,

---

[5] The figures for 2015 and 2016 were reported in CLU Amboy's tax returns for those years, while the 2017 figures are based on internal accountings through October 16, 2017

which would terminate upon a default on the VNB Note. VNB does not have a security interest in any of the assets of Amboy Group.

25. As noted above, the Facility required significant renovations over the course of approximately nine eighteen (18) months, thereby prohibiting Amboy Group from operating and generating income and paying rent to CLU Amboy, which in turn was unable to make the monthly mortgage payments to VNB. Due to the delay in Amboy Group having possession of the Facility, CLU Amboy sought a forbearance from VNB with respect to its obligations under the VNB Note. An agreement was not initially reached, and ultimately, VNB commenced a default action on July 15, 2014 against both Debtors and the three Guarantors, including myself, in the Superior Court of New Jersey, Law Division, Passaic County, under docket number L-2674-14. A companion foreclosure action was also initiated in the Superior Court of New Jersey, Chancery Division, Middlesex County, under docket number F-28607-14 (collectively, the "State Court Litigation").

26. The State Court Litigation was eventually resolved through a settlement agreement dated January 5, 2015 (the "Settlement Agreement"), which was approved by a stipulation entered by the Superior Court on January 13, 2015. The Settlement Agreement was subsequently twice amended, most recently on September 9, 2016. Pursuant to the Settlement Agreement, commencing on February 1, 2015, and continuing through no later than September 1, 2015, CLU Amboy, Amboy Group, and the Guarantors, agreed to pay VNB $500,000.00 for payment of outstanding amounts due, plus monthly payments of $51,683.00, consisting of the regular monthly payment of $38,270.55 plus $13,412.45. Through the amendments to the Settlement Agreement, the repayment deadline was extended to March 31, 2017.

27. VNB required CLU Amboy, Amboy Group, and the Guarantors to enter into certain agreements and provide additional collateral to obtain an extension. VNB also obtained from CLU

8

Amboy, Amboy Group, and the Guarantors two consent judgments and a power of attorney in favor of VNB to be submitted for entry upon default of the Settlement Agreement. One consent judgment is for a monetary judgment and the other consent judgment is for a foreclosure judgment on the Facility.

28. After making nearly two years' and 4 months of consecutive monthly payments, CLU Amboy was not allowed to continue to make its monthly settlement payment per VNB and was forced by VNB to default on its obligations under the Settlement Agreement. VNB filed a motion to re-open the state court proceedings and seeking entry of the consent judgments. At the hearing on Friday, October 13, 2017, the court entered the consent order for a monetary judgment in the amount of $7.1 million dollars.

29. As of August 4, 2017, it is my understanding that VNB asserts that the total amount of its claim, inclusive of interest, late charges, penalties, and legal fees, is $7,154,281.28, which amount is disputed. VNB's secured interests are fully and adequately protected. The value of the facility, of which VNB has a first mortgage, is $13,000,000.00. After subtracting the VNB debt of $7,154,281.28 VNB has an equity cushion of more than $5,845,719.00.

C. The Newtek Loans

30. On or about December 27, 2013, the Debtors entered into a promissory note (the "First Newtek Note") for a Small Business Association ("SBA") loan from Newtek Small Business Finance, Inc. ("Newtek") in the principal amount of $2,625,000.00, which matures on December 27, 2023, and has a variable interest rate of 2.75% above the Wall Street Journal Prime rate. The First Newtek Note is, among other things, secured by (1) a second mortgage on the Facility, (2) a first priority lien perfected by a recorded UCC-1 Financing Statement on the Debtors' assets, including "all inventory, equipment, fixtures, accounts, chattel paper, contract rights, instruments,

9

documents, and general intangible, and all products and proceeds thereof," and (3) guarantees by the Guarantors. As of the date hereof, the current balance due on the First Newtek Note is approximately $1,947,067.47, plus accrued interest, penalties and late fees.

31. The purpose of the First Newtek Note was to provide capital to the Debtors to renovate the Facility so that Amboy Group could begin operations there.

32. On or about June 23, 2014, the Debtors entered into a second promissory note (the "Second Newtek Note") for an SBA loan from Newtek in the principal amount of $1,816,000.00, which matures on June 25, 2025, and has an interest rate of 2.75% above the Wall Street Journal Prime Rate. The Second Newtek Note is, among other things, secured by (1) a third mortgage on the Facility, a second priority lien perfected by a recorded UCC-1 Financing Statement on the Debtors' assets, including Debtors' interest in all assets, general intangibles, chattel paper, instruments, goods, machinery, furniture, inventory, equipment and fixtures, and (3) guaranteed by the Guarantors. As of the date hereof, the current balance due on the Second Newtek Note is approximately $1,549,555.45, plus accrued interest, penalties and late fees.

33. The purpose of the Second Newtek Note was to infuse the Debtors with additional capital. The funds were needed to further defray the unexpected high costs of the renovation work to the Facility and to "kick-start" Amboy Group's operations to allow for optimal generation of revenues.

34. To induce Newtek into making the Second Newtek Note, Thomas Lambert ("Lambert"), Intercept Logistics, Inc. ("Intercept"),[6] and myself (collectively, the "Standby Creditors") each individually entered into Standby Creditor Agreements. Pursuant to the Standby

---

[6] This is a wholly owned company by William Colbert and Thomas Lambert which operates in New York.

10

Creditor Agreements, the Standby Creditors all agreed to suspend any Amboy Group payments with respect to debt owed to the Standby Creditors.

35.  Newtek is owed a total of $3,496,622.92, plus accrued interest, penalties and late fees. Given that the value of the Facility is $13 Million, Newtek is adequately protected by an equity cushion of $2.3 Million (after considering VNB's approximate $7.2 million first mortgage) before even factoring in the value of the Amboy Group's personal assets. Newtek is further protected by its first and second mortgage in real property owned by Paul Usak located at 2531 York Court, Seaford, New York.

### D.  Primary Capital Partners

36.  On July 24, 2017, Amboy Group entered into a Promissory Note for a loan from Primary Capital Partners ("Primary Capital") in the principal amount of $895,000.00 ("Amboy Group Primary Capital Note"). The Amboy Group Primary Capital Note is a refinancing and consolidation of four (4) earlier loans made by Primary Partners to Amboy Group: (1) $500,000.00 Note dated August 18, 2016; (2) $200,000.00 Note dated April 4, 2017; (3) $300,000.00 dated June 14, 2017; and (4) $50,000.00 Note dated June 29, 2017. Beginning August 1, 2017 and ending July 31, 2019, the Amboy Group Primary Capital Note is payable in equal weekly payments of $10,000.00 over two (2) years, with a 12% interest rate. This is an unsecured loan.

37.  On October 12, 2017, CLU Amboy entered into a Promissory Note for a loan from Primary Capital in the principal amount of $62,500.00 ("CLU Amboy Primary Capital Note"). Amboy Group, LLC entered into a Promissory Note for a loan from Primary Capital in the principal amount of $62,500 ("Amboy Primary Capital Note") (collectively, the "Notes") . The Notes have also a thirty (30) day, short-term loan at a 12% interest rate. This is an unsecured loan.

Attached as **Exhibit B** is the Loan and Security Agreement and Grid Promissory Note between Amboy Group, LLC and Primary Capital.

### E.    Salvatore J. Zizza

38.    On August 11, 2017, Amboy Group entered into a Promissory Note for a loan from Salvatore J. Zizza, the managing member of Primary Capital, in the principal amount of $150,000.00 ("First Zizza Note"). The First Zizza Note was a thirty (30) day, short-term loan at a 12% interest rate. This First Zizza Note is an unsecured loan. Mr. Zizza is the principal of Primary Capital, the proposed DIP lender (discussed herein). To date, Mr. Zizza or his company, Primary Capital, has invested over $1 Million in the Debtors.

### F.    Cause of Bankruptcy Filing

39.    There are two main causes for the need for Chapter 11 relief. First, the delay resulting from the inability to move into the Facility greatly stymied Amboy Group's earnings. In particular, the reduced income resulted in insufficient revenue to pay rent to CLU Amboy and the concurrent inability to make the mortgage payments to VNB.

40.    Second, Amboy Group suffers from certain inefficiencies in its operation, which Debtor will address with additional time to implement changes and a breathing spell before VNB's consent order attaches.

41.    Despite these issues, the Debtors' revenues have increased each of the last three years and the Debtors believe their revenues can increase even further. The Facility, particularly the temperature controlled storage component, is state of the art and with easy access to the Port of Newark. The Facility's storage capabilities and location have a natural appeal to entities seeking to transport and store perishable items, and it is believed that CLU Amboy's storage business will

continue to expand. Additionally, it is anticipated that a further revenue stream will manifest in the near future when Parmacotto sPa emerges from its Italian insolvency proceedings.

42. The Debtors' bankruptcy filings were commenced in order to provide an opportunity for the debtors to restructure their debt and operations so as to become more economical and maximize income potential from a business with clear growth potential.

### III. Summary of the First Day Motions

43. The Debtors seek to obtain bankruptcy court approval of certain actions that they need to take in order to prevent irreparable harm to the Debtors, their creditors, and the estate. Such actions include the Debtors' requests to pay the pre-petition wages post-petition in order to pay employees so that they continue to work, keeping their current bank accounts with notations of the bankruptcy case number, and providing deposits for the various utilities to keep the lights on as the Debtors transition into the chapter 11 bankruptcy process. Without the authority to take these actions, the Debtors' businesses will be significantly disrupted and irreparably harmed.

44. Additional facts concerning these First Day Motions are set forth in more detail in the McNamara Certification. In addition, the Debtors seek bankruptcy court approval of certain Debtors-in-Possession financing, including a DIP loan in the amount of $500,000.00 from Primary Capital and the continued use of cash collateral (the "Financing Motion"). The facts related to the Financing Motion are contained in the application in support of such motion.

I certify that the foregoing statements made by me are true and I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

By: ___/s/ William Colbert___
      William Colbert

Dated: October 25, 2017

4810-7653-7170, v. 1